# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| AMIR REZA OVEISSI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 11-cv-849 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This action arises out of the brutal February 1984 assassination of General Gholam Ali Oveissi on the streets of Paris, France.  The plaintiff, Amir Reza Oveissi, is General Oveissi's grandson.  This action is brought against defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") under the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, which was enacted as part of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA").  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).  That provision, codified at 28 U.S.C. § 1605A, provides "a federal right of action against foreign states."  *Simon v. Islamic Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008).  For the reasons set forth below, the Court finds that plaintiff has provided sufficient proof to support his causes of action, and determines that defendants may be held liable under the FSIA's updated state-sponsored terrorism exception.

## II.    PROCEDURAL HISTORY

### A.     Prior Oveissi Litigation

In 2003, plaintiff sued defendants over General Oveissi's 1984 assassination through the former state-sponsored terrorism exception codified at 28 U.S.C. § 1605(a)(7).  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 837 (D.C. Cir. 2009).  After the D.C. Circuit ruled that French law applied to plaintiff's substantive cause of action, this Court conducted a bench trial and entered liability and damages judgments against defendants.  *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 1 (D.D.C. 2010) (liability opinion); *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011) (damages opinion).  This Court awarded plaintiff $7.5 million in solatium damages but denied recovery for his alleged economic loss.  *Oveissi*, 768 F. Supp. 2d at 30–33.

### B.     This Action

Plaintiff here is again Amir Reza Oveissi, General Oveissi's grandson.  In the Complaint, plaintiff alleges the same essential facts concerning the 1984 assassination that were established by sufficient evidence in the 2010 *Oveissi* liability opinion.  Compl. ¶¶ 1–16.  On September 10, 2011, plaintiff served copies of the relevant papers, along with translations, by mail as required by 28 U.S.C. § 1608(a)(3).  Status Report, Oct. 17, 2011, ECF No. 7, ¶¶ 3–4.  Under the terms of 28 U.S.C. § 1605A, defendants had 60 days from that date—until November 9, 2011—to respond.  28 U.S.C. § 1608(d).  After none of the defendants appeared or responded, the Clerk of the Court entered default on plaintiff's behalf.  Clerk's Entry of Default, Jan. 10, 2012, ECF No. 11.  Plaintiff then moved for default judgment in accordance with § 1608(e).  Mot. for Default J., Jan. 19, 2012, ECF No. 13.  Based on that motion, the record, and facts available for judicial notice, the Court makes the following findings of fact and conclusions of law.

## III.    FINDINGS OF FACT

The Clerk of the Court entered defendants' default on January 10, 2012.  However, prior to entry of final default judgment, the FSIA requires that courts evaluate the evidence before them to ensure that plaintiffs have established their right to relief "by evidence that is satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotations omitted).

In considering whether to enter default judgment, courts in FSIA cases look to various sources of evidence to satisfy their statutory obligation.  Courts may, for example, rely upon plaintiff's "'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'"  *Valore*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (alteration in original; quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).  In addition to more traditional forms of evidence—testimony and documentation—plaintiffs in FSIA cases may also submit evidence in the form of affidavits. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (citing *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006)).  Finally, a FSIA court may "'take judicial notice of related proceedings and records in cases before the same court.'"  *Valore*, 700 F. Supp. 2d at 59 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009)).  Here, plaintiffs rely on judicial notice in support of their motion for default judgment.

### A.      Judicial Notice of Prior Related Cases

Under the Federal Rules of Evidence, courts are permitted to take judicial notice of facts "not subject to reasonable dispute" where those facts are either "generally known within the

territorial jurisdiction" or are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This rule permits courts to take judicial notice of court records in related proceedings. 29 Am. Jur. 2d *Evidence* § 151 (2010); *see also Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . ."); 2 McCormick on Evid. § 332 (6th ed. 2009) (noting that the principle permitting courts to take judicial notice of current proceedings "is equally applicable to matters of record in the proceedings in other cases in the same court"). Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings. *See, e.g.*, *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010); *Valore*, 700 F. Supp. 2d at 59–60; *Brewer*, 664 F. Supp. 2d at 50–51.

A difficult issue arises concerning judicial notice of related proceedings with regard to courts' prior factual findings. While such findings in a prior proceeding are "capable of accurate and ready determination" from judicial records, Fed. R. Evid. 201(b), it cannot be said that these same findings are "not subject to reasonable dispute." *Id.* Specifically, such findings represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events. As such, they constitute hearsay, and thus are considered inadmissible. *Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 110 (D.D.C. 2007) (citing *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994)).

This Court grappled with these difficulties in *Rimkus*, where— "mindful that the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack," 750 F. Supp. 2d at 163 (citing *Brewer*, 664 F. Supp. 2d at 54)—it determined that the proper approach is one "that permits

courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . .

without necessitating the formality of having that evidence reproduced." *Id.* (citing *Murphy*, 740

F. Supp. 2d at 58). Thus, based on judicial notice of the evidence presented in the earlier cases—

here, the prior *Oveissi* liability and damages opinions—courts may reach their own independent

findings of fact.

      **B.    Relevant Findings of Fact**

      Plaintiff seeks to have the default judgment he received in the prior *Oveissi* litigation

confirmed under 28 U.S.C. § 1605A. *See Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp.

2d 25, 30–31 (D.D.C. 2010) (confirming an earlier FSIA § 1605(a)(7) judgment under § 1605A).

There being no intervening events that would raise any concerns regarding the validity of the

Court's findings of fact in the prior *Oveissi* litigation, 498 F. Supp. 2d at 272–74; 768 F. Supp.

2d at 6–7, this Court adopts its prior findings of fact in their entirety. In summary, the Court

finds the following:

> Gholam Oveissi was a general and high-ranking official in Iran prior to the 1979
> revolution, which saw the rise of Ayatollah Khomeini and the transformation of
> Iran into an Islamic state. Shortly before the revolution, General Oveissi and his
> family fled to the United States, where Amir Reza was born. After a brief stay in
> the U.S., the family settled in Paris, France, where they resided for nearly five
> years. Their stay in Paris was cut short, however, after Gholam Oveissi was
> gunned down in a busy street in February 1984. Islamic Jihad—a relatively-
> unknown group at the time—immediately claimed responsibility for the
> assassination. Following his brutal murder, the remaining members of Gholam
> Oveissi's family, including five year-old Amir Reza, were whisked away to
> Africa, and eventually made their way back to the United States, where plaintiff
> has since resided. Since his grandfather's death, plaintiff—and the world—has
> learned that Islamic Jihad was actually a cell composed of members of the
> terrorist organization Hezbollah, and that the group acted under the direction of
> MOIS, and were materially supported by Iran.

*Oveissi*, 768 F. Supp. 2d at 17 (quotations omitted).

**IV.    CONCLUSIONS OF LAW**

Based on these findings of fact, the Court reaches the following conclusions of law:

**A.      Jurisdiction**

Subject to certain enumerated exceptions—including the state-sponsored terrorism exception—the FSIA simultaneously provides immunity to foreign states from suit and denies all United States federal and state courts jurisdiction over such actions.  28 U.S.C. § 1604.  Under certain conditions, however, courts obtain original jurisdiction for suits against foreign states, and those states' general immunities are waived by operation of statute.  Based on the evidence here, these conditions have been met.

**1.      Original Jurisdiction**

The state-sponsored terrorism exception provides that federal courts possess original jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act."  28 U.S.C. § 1605A(a)(1).

Here, each of these prerequisites is met.  First, plaintiff has only identified monetary remedies in his Complaint, ¶¶ 6–16, rendering this a suit involving only "money damages."  Second, defendant Iran is plainly a foreign state.  With respect to defendant MOIS, the FSIA defines foreign state to include "a political subdivision . . . or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Applying this definition, courts in this jurisdiction have been directed to ask whether an entity "is an integral part of a foreign state's political structure"; if so, that defendant is treated as a foreign state for FSIA purposes.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted).  Here, the evidence establishes that MOIS is a division of the state of Iran that acted as a conduit for the

state's provision of funds to terrorist organizations, including Hezbollah.  Defendant MOIS is thus a foreign state for purposes of these proceedings.  *See Oveissi*, 498 F. Supp. 2d at 275 (finding MOIS to constitute a foreign state), *rev'd on other grounds*, 573 F.2d 835.

Third, the Complaint contains claims arising out of the murder of General Oveissi. Compl. ¶¶ 6–16.  These claims clearly involve "personal injury or death" under FSIA § 1605A(a)(1).  Fourth, the evidence establishes that defendant Iran founded Hezbollah for the purpose of undertaking attacks such as the 1984 assassination and funneled money to the terrorist organization through defendant MOIS, and also demonstrates that both defendants played necessary planning, logistical and support roles leading up the horrific attack.  *See Oveissi*, 498 F. Supp. 2d at 273–74.  This is more than sufficient to satisfy the FSIA's requirement that there be "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered."  *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted). Finally, the 1984 assassination constitutes an extrajudicial killing that occurred as a direct and proximate result of defendants' conduct in providing financial and military assistance to the attackers.  On the basis of these findings, the Court has jurisdiction over plaintiff's claims.

## 2.    Waiver of Sovereign Immunity

While this Court's exercise of jurisdiction over this action is a necessary prerequisite to moving forward, foreign states remain immune from suit absent a waiver of sovereign immunity. Waiver of a foreign states' immunity can occur either by that state's own action or by operation of statute.  The state-sponsored terrorism exception provides that such waiver occurs where (1) "the foreign state was designated as a state sponsor of terrorism at the time of the act . . . or was *so designated as a result of such act*, and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under

this section," (2) the claimant or the victim was, at the time of the act . . . a national of the United

States [or] a member of the armed forces [or] otherwise an employee of the Government of the

United States . . . acting within the scope of the employee's employment," and (3) "in a case in

which the act occurred in the foreign state against which the claim has been brought, the

claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28

U.S.C. § 1605A(a)(2)(i)–(iii) (emphasis added).

Here, the established facts warrant waiver of defendants' sovereign immunity as provided

by the FSIA.  First, Iran has been designated as a state sponsor of terrorism continuously since

January 1984—one month prior to General Oveissi's assassination.  U.S. Dep't of State,

*Determination Pursuant to* Section 6(i) *of the Export Administration Act of 1979—Iran*, 49 Fed.

Reg. 2836-02, Jan. 23, 1984 (designating Iran upon concluding that "Iran is a country which has

repeatedly provided support for acts of international terrorism").  Second, plaintiff is a United

States citizen and was so at the time of the attack.  *Oveissi*, 498 F. Supp. 2d at 272, 275.  Finally,

because the assassination occurred in Paris, France—and not Iran—the FSIA's requirement that

defendants be given an opportunity to arbitrate this claim is inapplicable here.  For these reasons,

defendants' immunity is waived and they may be held liable for the assassination.[1]

**B.      Liability**

FISA § 1605A(c) creates a federal private right of action for victims of state-sponsored

terrorism.  Specifically, a plaintiff can seek to hold a foreign state liable for (1) "an act of torture,

extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or

resources for such an act" where (2) the act was committed, or the provision provided, by the

---

[1] Plaintiff served the Complaint on defendants by mail on September 10, 2011, as authorized under FSIA, 28 U.S.C. § 1608(a)(3).  Status Report, Oct. 17, 2011, ECF No. 7, at ¶¶ 3–4.  The Court thus has personal jurisdiction over the defendants.  *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under § 1608).

foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4)

"personal injury or death" (5) "for which courts of the United States may maintain jurisdiction

under this section for money damages."  28 U.S.C. § 1605A(a)(1) & (c).  As the Court has

recently discussed at length, the third and fourth elements—causation and injury—"require

plaintiffs to prove a theory of liability" in which plaintiffs articulate a justification for the

recovery of the damages which they seek, generally expressed "through the lens of civil tort

liability."  *Rimkus*, 750 F. Supp. 2d at 176.  Therefore, the Court will apply the facts of this case

to each of these elements in turn.

### 1.    Act

On the basis of the evidence presented in *Oveissi*, 498 F. Supp. 2d 268, plaintiff here has

sufficiently established that defendants was responsible for the horrific assassination of General

Oveissi on the streets of Paris in February 1984.  The evidence concerning the actions of

defendants Iran and MOIS demonstrates that they are culpable both for the extrajudicial killing

of General Oveissi and for the provision of material support to the members of Hezbollah

participating in the assassination, in satisfaction of the first element of liability under the federal

cause of action.

FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim

Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> [(1)] a deliberate killing [(2)] not authorized by a previous
> judgment pronounced by a regularly constituted court [(3)]
> affording all judicial guarantees which are recognized as
> indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence presented in

*Oveissi*, 498 F. Supp. 2d at 273–74, establishes that, prior to the assassination, orders were issued

to Hezbollah members by Iran seeking to silence expatriate Iranian dissidents in France,

including General Oveissi. *Id.* There is no evidence that this order was sanctioned by any judicial body, and the order to kill a political refugee was in direct contravention of civil guarantees recognized as indispensable to all free and civilized peoples. Based on these findings, the assassination of General Oveissi constitutes an extrajudicial killing, undertaken by members of Hezbollah acting as agents for defendants Iran and MOIS.

The FSIA declares that the concept of "material support or resources" is defined by reference to the federal criminal code. 28 U.S.C. § 1605A(h)(3). That definition states that support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The evidence presented at the *Oveissi* trial demonstrates that during the period leading up to the assassination, Iran founded and supported Hezbollah for the purpose of advancing its own agenda. 498 F. Supp. 2d at 273–75. Testimony of multiple expert witnesses establishes that Hezbollah was essentially composed of a number of Iranian agents who were supported tangibly and financially by Iran and MOIS. *Id.* And more specifically, the evidence shows that Iran "provided logistical support and training" to Hezbollah in carrying out political assassinations. *Id.* at 273–274. Taken together, these acts plainly constitute the provision of material support for FSIA purposes.

## 2. Actor

The evidence presented in *Oveissi* establishes that Hezbollah acted generally as an agent of Iran during 1984, and that it was effectively "an arm of the Iranian state." 498 F. Supp. 2d at 274. Under such circumstances, defendants may be held vicariously liable for the extrajudicial

killing perpetrated by the bombers.  *See Murphy*, 740 F. Supp. 2d at 71–72 (holding that

defendant foreign state may be held liable where Hezbollah agents "acted at the behest and under

the operational control of defendants").

### 3.     Theory of Recovery – Causation

The elements of causation and injury in the federal cause of action created by § 1605A

require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants

culpable for the injuries that the plaintiffs allege to have suffered.  *Valore*, 700 F. Supp. 2d at 73;

*see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate

the justification for such recovery, generally through the lens of civil tort liability.").  When

determining the contours of these theories, the D.C. Circuit has cautioned that while the "extent

and nature" of such claims "are federal questions," the FSIA "does not . . . authorize the federal

courts to fashion a complete body of federal law."  *Bettis v. Islamic Republic of Iran*, 315 F.3d

325, 333 (2003).  Based on the Circuit Court's guidance, District Courts in this jurisdiction "rely

on well-established principles of law, such as those found in Restatement (Second) of Torts and

other leading treatises, as well as those principles that have been adopted by the majority of state

jurisdictions" to outline the boundaries of these theories of recovery.  *In re Islamic Republic of

Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009).  In the initial *Oveissi* litigation,

plaintiff received relief under a French tort law similar to an intentional infliction of emotional

distress theory and received a judgment in the amount of $7,500,000.  Compl. ¶¶ 7–9; *Oveissi*,

768 F. Supp. 2d at 9–15.  Here, the Court must ensure that plaintiff satisfies the requirements for

an intentional infliction of emotional distress award under the federal cause of action in FSIA §

1605A(c).

This Court and others have frequently addressed the intentional infliction of emotional distress theory following enactment of FSIA § 1605A(c).  Relying principally on the Restatement, courts have set forth the following standard:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)).  The scope of recovery under this theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time."  Restatement (Second) of Torts § 46(2)(a)–(b).  The former qualification is of no consequence here, as plaintiff is the grandson of the decedent and this Court has previously found that their relationship was more "like that of a father-son relationship . . . ."  *See Oveissi*, 768 F. Supp. 2d at 28; Valore, 700 F. Supp. 2d at 79 (noting that immediate family "is consistent with the traditional understanding of one's immediate family" and includes "one's spouse, parents, siblings, and children").

The issue of presence, however, warrants a bit more discussion.  Plaintiff's father immediately "whisked" the family from Paris to Morocco where plaintiff was informed of his grandfather's death.  *Oveissi*, 498 F. Supp. 2d at 274.  There is no evidence plaintiff was present for the actual assassination.  However, this Court has previously recognized that the presence requirement is subject to a caveat—specifically, the Restatement "'expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability.'" *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46).  As the *Heiser* Court explained:  "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims . . . . 'All acts of terrorism are by the very definition extreme and

outrageous and intended to cause the highest degree of emotional distress, literally, terror.'" *Id.*
at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  Thus,
the Court concluded that a plaintiff "need not be present at the place of outrageous conduct, but
must be a member of the victim's immediate family." *Id.*  Following this holding, the *Valore*
Court determined that the Beirut bombing qualified as an extreme and outrageous act sufficient
to invoke this theory of recovery for non-present plaintiffs, 700 F. Supp. 2d at 79–80, and the
Court shall do the same here.  Defendants are thus liable for the mental anguish and suffering
that plaintiff has endured as a result of the assassination of General Oveissi.

### 4.      Personal Injury

This Court has already determined in Part IV.A.1 that plaintiff has brought an action for
"personal injury or death" by bringing a claim arising out of the assassination of General Oveissi.

### 5.      Jurisdiction

The Court has already determined in Part IV.A.1 that it is proper to exercise jurisdiction
over defendants in this action, and that plaintiff is only seeking monetary compensation.  This
final element is thus satisfied, and defendants may be properly held liable and their award may
be confirmed under the federal cause of action embodied in 28 U.S.C. § 1605A(c) for the 1984
assassination of General Oveissi.

## V.      DAMAGES

Damages available under the FSIA-created cause of action "include economic damages,
solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Accordingly, those
who survived the attack may recover damages for their pain and suffering, as well as any other
economic losses caused by their injuries; estates of those who did not survive can recover
economic losses stemming from wrongful death of the decedent; family members can recover

solatium for their emotional injury; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 82–83.

"To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)). As found in the initial *Oveissi* litigation, plaintiff has proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to—and indeed intended to—cause injury to plaintiff. 498 F. Supp. 2d at 272–75.

### A.   Confirmation of Solatium Award

In Count 1 of the Complaint, plaintiff requests a confirmation of his FSIA § 1605(a)(7) solatium award as a FSIA § 1605A(c) solatium award. Compl. at 7. This Court previously conducted a detailed analysis of plaintiff's solatium damages in *Oveissi*, 768 F. Supp. 2d 25–30. This Court sees no reason to change its analysis and therefore confirms the entire $7.5 million solatium award under 28 U.S.C. § 1605A.

### B.   Punitive Damages

In Count 2 of the Complaint, plaintiff requests punitive damages under § 1605A(c). Compl. at 8. While plaintiff argues that "[t]he measure of punitive damages should be based on the economic losses that Mr. Oveissi suffered as a result of his grandfather's murder," Compl. ¶ 11, such considerations would be inconsistent with prior cases. Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for

which they are awarded.  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61;

*Heiser*, 659 F. Supp. 2d at 29–30; *Acosta*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (citing

Restatement (Second) of Torts § 908(1)).  Punitive damages are not meant to compensate the

victim, but instead meant to award the victim an amount of money that will punish outrageous

behavior and deter such outrageous conduct in the future.  In determining the proper punitive

damages award, courts evaluate four factors: "(1) the character of the defendants' act, (2) the

nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the

need for deterrence, and (4) the wealth of the defendants."  *Acosta*, 574 F. Supp. 2d at 30 (citing

*Flatow*, 999 F. Supp. 1, 32 (D.D.C. 1998) (citing Restatement (Second) of Torts § 908)).

The nature of the defendants' act and the nature and extent of the harm defendants

intentionally caused are among the most heinous the Court can fathom.  *See Bodoff*, 424 F. Supp.

2d at 88 (determining a bus bombing, for which Iran was held liable, to be "extremely heinous").

"The defendants' demonstrated policy of encouraging, supporting and directing a campaign of

deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum

pain and suffering on innocent people."  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d

258, 278 (D.D.C. 2003) (concerning a separate bus bombing for which Iran and MOIS were held

liable).  The evidence in this case shows that defendants lacked any semblance of remorse for

this horrific assassination—and in fact, encouraged and supported this and similar assassinations.

As to deterrence and wealth, Iran is a foreign state with substantial wealth and has

expended significant resources sponsoring terrorism.  Dr. Patrick Clawson, an expert on Iranian

terrorism activities, has testified in several cases on the amounts of punitive damages that would

serve to deter Iran from supporting terrorist activities against nationals of the United States.  *See*,

*e.g.*, *Flatow*, 999 F. Supp. at 32; *Heiser*, 659 F. Supp. 2d at 30.  Dr. Clawson declared that "the

financial material support provided by Iran in support of terrorism is in the range of $300 million

to $500 million a year." Clawson Aff. ¶ 4, *Valore*, 700 F. Supp. 2d 52 (03-cv-1959, ECF No.

58).  Dr. Clawson based his range on Iran's provision of approximately $200 million in direct

cash assistance to Hezbollah in 2008, as well as the provision since 2006 of "many tens of

millions of dollars" worth of sophisticated weaponry, including some 40,000 rockets.  *Id.* ¶ 3.a.

(citing U.S. Dep't of State, Country Reports on Terrorism 2008, at 183 (2009), *available at*

http://www.state.gov/documents/organization/122599.pdf).

      In addition, the Court finds it appropriate to examine awards that courts have issued in

similar state-sponsored terrorism cases.  Considering similar cases will assist this Court in

following the Supreme Court's instruction that a punitive damages award be "reasonably

predictable in its severity . . . so that [a] . . . bad man can look ahead with some ability to know

what the stakes are in choosing one course of action or another."  *Exxon Shipping Co. v. Baker*,

554 U.S. 471, 502 (2008).

      In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008), Judge Collyer

awarded a total of $300,000,000 ($150,000,000 per victim) in punitive damages against Syria for

the beheading of two civilian contractors.  Similarly, in *Acosta*, this Court awarded $300,000,000

in punitive damages against Iran for the 1990 assassination of Rabbi Kahane and wounding of

two other American citizens in New York City.  574 F. Supp. 2d at 30–31.  Magistrate Judge

Facciola awarded a total of $450,000,000 ($150,000,000 per victim) to the families of three

victims executed during the hijacking of EgyptAir Flight 648.  *Baker v. Socialist People's*

*Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  In his survey of FSIA punitive

damages cases, Magistrate Judge Facciola noted that "this Court had, with one exception, never

awarded an amount higher than $300,000,000 in punitive damages against Iran."  *Id.*  Most

recently in *Wultz v. Islamic Republic of Iran*, this Court awarded $300,000,000 in punitive

damages arising out of a terrorist bombing at a Tel Aviv restaurant that severely wounded a

father and killed his teenage son.  2012 WL 1664027 (D.D.C. May 14, 2012), at *15.  Therefore,

in light of prior case law, the four factors this Court considers under the Restatement, and the

extreme depravity of Iran's acts, this Court finds that it is appropriate to award plaintiff

$300,000,000 in punitive damages.

However, there is one more step to the inquiry.  This Court must consider whether a

$300,000,000 punitive damages award comports with recent Supreme Court guidance on

punitive damages.  This Court addressed this issue at length in *Beer v. Islamic Republic of Iran*,

789 F. Supp. 2d 14, 16–26 (D.D.C. 2011) (Lamberth, C.J.), and will not rehash its detailed

analysis from that case.  In sum, this Court in *Beer* held that foreign sovereigns cannot use the

constitutional constraints of the Fifth Amendment due process clause to shield themselves from

large punitive damages awards and that this Court's longstanding method for the calculation of

punitive damages in FSIA terrorism cases remains viable.  *Id.* at 20, 26.  Therefore, plaintiff is

entitled to $300,000,000 in punitive damages.

### C.        Reasonably Foreseeable Property Loss

In Count 3 of the Complaint, plaintiff seeks an award for property loss.  Under 28 U.S.C.

§ 1605A(d), plaintiff may recover "reasonably foreseeable property loss . . . by reason of the

same acts on which" his private right of action is based.[2]  This Court's 2011 *Oveissi* damages

opinion found that General Oveissi owned assets totaling roughly $749 million at the time he

was forced to flee Iran due to the 1979 Iranian Revolution.  768 F. Supp. 2d at 31.  Plaintiff

---

[2] FSIA § 1605A(d), with emphasis added, provides:
> Additional damages.—After an action has been brought under subsection (c), actions may also be brought for **reasonably foreseeable property loss**, whether insured or uninsured, third party liability, and loss claims under life and property insurances policies, **by reason of** the same acts on which the action under subsection (c) is based.

argues that "[i]t was reasonably foreseeable that the extrajudicial murder of General Oveissi would cause General Oveissi and his heirs to" lose this $749 million.  Pl. Mot., ECF No. 13, at 15.

The language of § 1605A(d) contains two causation elements: (1) the property loss must come "by reason of" the extrajudicial killing, and (2) the property loss must be a "reasonably foreseeable" result of the extrajudicial killing.[3]  The first statutory requirement roughly parallels the traditional tort law requirement that a plaintiff prove "but for," or "factual causation."  *See U.S. v. Monzel*, 746 F. Supp. 2d 76, 86 (D.D.C. 2010) (citing Restatement (Third) of Torts § 27 (2010)); *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 111–113 (D.D.C. 2006).  The second statutory requirement roughly parallels the traditional tort law requirement that plaintiff prove proximate or legal causation.  *See Owens*, 412 F. Supp. 2d at 114–115.  The Court will address each requirement in turn.

First, plaintiff cannot show that the extrajudicial killing of General Oveissi was the "reason" for his alleged property loss.  Said in other words, plaintiff cannot show that "but for" the extrajudicial killing, he would have inherited any part of the $749 million in property.  At the time of General Oveissi's death in 1984, the General was exiled in Paris and had no possession of or control over the property; it had apparently been expropriated by the revolutionary Iranian government five years earlier.  Thus, the reason for General Oveissi's property loss—and, in turn, the reason for plaintiff's alleged loss of an inheritance—is the 1979 Iranian Revolution.  The reason for plaintiff's alleged loss is not General Oveissi's 1984 assassination.

---

[3] The Court notes that this factual and legal causation analysis may appear slightly different than the analysis it conducted in its 2011 *Oveissi* damages opinion.  *See* 768 F. Supp. 2d at 31–33.  The reason for this difference is that the earlier opinion was decided under the now-repealed FSIA § 1605(a)(7) and attempted to apply general principles of wrongful death and survival actions.  Here, the Court conducts its analysis based on the text of § 1605A(d) and not based on common law wrongful death or survival actions.  It is true that there are rough parallels to traditional tort law in the language of the statute.  Nonetheless, where traditional tort law may conflict with the language of the statute, the language of the statute must control.

Second, plaintiff cannot show that the alleged inheritance loss was a "reasonably foreseeable" result of General Oveissi's assassination.[4]  General Oveissi may have somehow lead a successful counter-revolution against the Iranian regime during or after 1984 and reclaimed his property—which plaintiff then could have inherited.  However, this is only one of an unlimited number of alternative histories that could have emerged had General Oveissi lived.  Had he lived, General Oveissi could also have modified his will or otherwise disposed of the property so that plaintiff would not have inherited any part of the $749 million.  This Court simply cannot engage in the speculative venture plaintiff seeks, and has previously refused to entertain this type of historical revisionism.  *Oveissi*, 768 F. Supp. 2d at 33 ("Whether General Oveissi might have subsequently reclaimed his rights sometime after 1984 had he not been killed is pure speculation, and thus cannot provide a substantive legal basis upon which to award extensive damages for the property that he undisputedly lost control over in 1979.").

In light of plaintiff's failure to show that his alleged property loss occurred "by reason of" the assassination or that his alleged property loss was a "reasonably foreseeable" result of the 1984 assassination, plaintiff may not recover damages under FSIA § 1605A(d).

### D.       Prejudgment Interest

Plaintiff's complaint also requests prejudgment interest.  Compl. at 7–9.  Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations.  *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008).  As an element of compensation, prejudgment interest would only be available on the solatium damages awarded in this case.  *West Virginia v. United States*, 479 U.S.

---

[4] To illustrate how this analysis is different than a common law analysis, in a proximate cause analysis under traditional tort law, "[w]here a person has intentionally invaded the legally protected interests of another . . . the degree of his moral wrong in acting and the serious of the harm which he intended are important factors in determining whether [defendant] is liable for resulting unintended harm."  Restatement (Second) of Torts § 435B.  However, under § 1605A(d), the touchstone is foreseeability—not moral culpability or seriousness of the harm.

305, 311–312 (1987) ("Prejudgment interest is an element of complete compensation"). Even so, when this Court applies the *Heiser* damages framework—as it did in the underlying solatium award here—it has consistently refused to award prejudgment interest. *Oveissi*, 768 F. Supp. 2d at 30 n.12 (concluding that prejudgment interest was not warranted for solatium damages because the values set by the *Heiser* scale "represent the appropriate level of compensation, regardless of the timing of the attack."); *accord Harrison v. Republic of Sudan*, 10-cv-1689 (D.D.C. Mar. 30, 2012), 2012 WL 1066683, at *24; *Wultz*, 2012 WL 1664027, at *16–17; *Brown*, 2012 WL 2562368 (D.D.C. July 3, 2012), at *6. Therefore, this Court DENIES plaintiff's request for prejudgment interest.

## VI. CONCLUSION

Over twenty-eight years have passed since Iranian agents gunned down General Oveissi on a crowded street in Paris. While justice for Amir Oveissi has been delayed for decades, and while collecting on this award may prove tremendously difficult, this Court applauds his longstanding efforts to hold Iran accountable for its cowardly support of terrorism. The Court concludes that defendant Iran must be punished to the fullest extent legally possible for the violent assassination of plaintiff's father, General Gholam Ali Oveissi. This horrific act impacted the Oveissi family deeply and this Court hopes that the family may find some measure of solace from this Court's final judgment today. For the reasons set forth above, the Court finds that defendants are responsible for plaintiff's injuries and thus are liable under the FSIA's state-sponsored terrorism exception for $7,500,000 in compensatory solatium damages and $300,000,000 in punitive damages.

A separate Order and Judgment consistent with this opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on July 25, 2012.